**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CHAU THUY LE,

                   Plaintiff,

     v.

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES, *et al.*,

               Defendants.

Case No. 21-cv-501 (JMC)

**<u>MEMORANDUM OPINION</u>**

Plaintiff Chau Thuy Le, a citizen of Vietnam, seeks review of a decision by Defendant United States Citizenship and Immigration Services (USCIS) denying her petition for an EB-5 visa. Under the EB-5 program, a foreign national can obtain a visa in exchange for investing a specified amount of capital into a U.S. business to promote job creation in the United States. Le invested just over $500,000, the minimum at the time, through a so-called "currency swap" to avoid Vietnam's limits on currency exchange. USCIS denied her visa on the ground that she failed to prove that she acquired those invested funds through lawful means, as the applicable regulation requires. Le challenges that finding, calling it arbitrary and capricious and the product of a legislative rule issued without the requisite notice-and-comment procedures. In the alternative, she seeks discovery into the possibility that Defendants applied the lawful-means requirements for EB-5 petitions involving  currency swaps to her case in an impermissibly retroactive fashion. Defendants USCIS and its Acting Chief Todd Young oppose.

The Court finds no basis in the record to overturn USCIS's denial decision or grant outside-the-record discovery into Le's retroactivity claim. Accordingly, the Court will **DENY** Le's

motions for summary judgment and for leave to conduct limited discovery, ECF 20, and will **GRANT** Defendants' cross-motion for summary judgment, ECF 23.[1]

## I.    BACKGROUND

### A.  Statutory and Regulatory Framework

The EB-5 program provides visas to "qualified immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise" ("NCE") that creates at least 10 full-time jobs in the United States. 8 U.S.C. § 1153(b)(5)(A). The "Regional Center Program," which is a more recent addition to the EB-5 program, allows for the creation of regional centers that "pool[]" investments in a limited geographic area to have a "substantive economic impact" on the area. *Id.* § 1153(b)(5)(E)(iii).

To qualify for an EB-5 visa, the applicant must make an investment of at least a certain dollar amount set by statute and implementing regulations. *See id.* § 1153(b)(5)(C). If the applicant invests in an area designated as a "targeted employment area," meaning a rural area or an area with high unemployment, the threshold for a qualifying investment is lower than it otherwise would be. *See id.* § 1153(b)(5)(C)(ii), (D)(viii). At the time of Le's visa petition, USCIS's regulation required a minimum $500,000 investment in a "targeted employment area" to qualify. *See* 8 C.F.R. § 204.6(f)(2) (2016).[2]

Under the statute, the petitioner must have "invested" or be "actively in the process of investing," "capital" in a "new commercial enterprise." 8 U.S.C. § 1153(b)(5)(A) (2006).[3] The

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

[2] USCIS increased this and other amounts in 2019. Other provisions of the regulation relevant to this case have remained the same since the 2016 version at issue here. *See* 8 C.F.R. § 204.6 (2019); 8 C.F.R. § 204.6 (2020).

[3] The statue was updated with more detail on those requirements in 2022, when the Regional Center Program was re-authorized. *See* EB-5 Reform and Integrity Act of 2022, Pub. L. No. 117–103, 136 Stat. 1070 (codified at 8 U.S.C. §

implementing regulation defines "capital" for purposes of "this section" (of the regulation) as, in part, "cash, equipment, inventory, other tangible property, cash equivalents, and indebtedness secured by assets owned by the alien investor." 8 C.F.R. § 204.6(e). It also provides that "[a]ssets acquired, directly or indirectly, by unlawful means (such as criminal activities) shall not be considered capital for the purposes of section 203(b)(5) of the Act." *Id*. In other words, assets acquired illegally are not "capital" whose "investment" in a "new commercial enterprise" can qualify an immigrant for an EB-5 visa. *Id.*

Along those same lines, the regulation requires that petitions for this program "must be accompanied by evidence that the alien has invested or is in the process of investing lawfully obtained capital in a new commercial enterprise in the United States." *Id.* § 204.6(j). The rule then lists, among other things, the kinds of evidence that the petitioner can submit "[t]o show that the petitioner has invested, or is actively in the process of investing, capital obtained through lawful means." *Id*. § 204(j)(3). These can include "[f]oreign business registration records," tax returns filed within five years "with any taxing jurisdiction in or outside the United States or on behalf of the petitioner," or "[e]vidence identifying any other source(s) of capital." *Id*. § 204.6(j)(3)(i)-(iii). They can also include copies of "monetary judgments against the petitioner from any court in or outside the United States within the past fifteen years." *Id.* § 204.6(j)(3)(iv).

In addition, the rule has a special provision for commercial enterprises receiving investments from more than one investor (i.e., at least one investor besides the EB-5 applicant). That provision requires that "the source(s) of all capital invested" in such projects "is identified and all invested capital has been derived by lawful means." *Id.* § 204.6(g)(1).

---

1153). That revision codified some of the definitions in the regulation. But that version was not in place at the time of Le's petition or the agency's decision.

The Board of Immigration Appeals (BIA) has repeatedly held, in precedential adjudicatory decisions, that an applicant seeking an EB-5 visa must provide evidence documenting the "path of the funds" from the investor to the recipient commercial enterprise in the United States. *See, e.g.*, *In re Izummi*, 22 I. & N. Dec. 169, 195 (B.I.A. 1998). This information proves that the funds invested in the commercial enterprise "were [the applicant's] own funds." *Id*. In addition, the agency and reviewing courts have explained that evidence of both the "source" and "path" of the funds is necessary for the applicant to establish that it is "more likely than not" that the funds are derived from a "lawful source." *Sadeghzadeh v. USCIS*, 322 F. Supp. 3d 12, 17–18 (D.D.C. 2018); *accord In re Soffici*, 22 I. & N. Dec. 158, 164–65 (B.I.A. 1998) (holding that the "[s]ource of funds" is "relevant to the question of whether the funds have been lawfully obtained, which is a requirement under 8 C.F.R. § 204.6(j)(3)").

### B.  Factual Background

Plaintiff Le, a citizen and resident of Vietnam, filed a Form I-526 in December 2016 as a petition for her EB-5 visa. ECF 28-1 at 301–03. In her petition, she declared that she had invested $550,000 for a 1% share in the ownership of an NCE that sought to redevelop the former Federal Reserve building in Kansas City, Missouri, into a hotel. *Id*. at 302, 305. Attached to her petition, Le submitted documents substantiating (a) the compliance of the commercial enterprise with regulatory requirements (e.g., job creation), and (b) how she and her husband lawfully earned the Vietnamese equivalent of $550,000 (approximately 12 billion Vietnamese Dongs ("VND")) through his income and the sales of three properties in Vietnam. *See id*. at 305–318, 320–21, 323–538. In addition, Le submitted four pages of documents showing the path of the funds from Le to the NCE. Those documents indicated that she sent VND 12,827,166,000.00 to a Mr. Nguyen Van Vinh—a "representative" of VNT Trading and Investment Pte ("VNT Trading") in Vietnam—and

that VNT Trading then paid, from its bank account in Singapore, $550,050.00, the equivalent in USD (minus a fee), to a bank account in the United States under the name of FRBH, LP, which was the NCE. *Id.* at 540–43. Le's attached documents included a letter stating that VNT Trading's "role was limited exclusively to the conversion of Ms. Le's personal property—the funds—to U.S. dollars and we have acted only at her direction at all times." *Id.* at 541. That "conversion" is also referred to as a currency swap.

In response, on May 1, 2018, USCIS sent a Courtesy Request for Clarification to Le's counsel. The Request included guidance on the evidence required for petitioners who used "third party exchanger[s]/broker[s]" to demonstrate that the assets they invested were not "acquired directly or indirectly by unlawful means" under 8 C.F.R. § 204.6(e). ECF 28-1 at 251–52. The Request explained, consistent with the regulation: "Every Petitioner must demonstrate that the funds invested are Petitioner's funds and that the funds invested were not obtained directly or indirectly by unlawful means such as criminal activity." *Id.* at 252. It then applied that rule to currency exchanges or swaps:

> If a Petitioner's funds were routed through value transfer exchange through a third party exchanger/broker, and there is insufficient documentation to demonstrate the legitimacy of the exchanger/broker and its funds (such as licensing and registration documents), Petitioner bears the burden of demonstrating that the funds transferred by the third party to Petitioner's bank account/the NCE were obtained through lawful means.

*Id.* In other words, the Request explained, "[t]o determine the lawful source of Petitioner's investment capital involving a value transfer exchange utilizing a third party exchanger, the petitioner must submit evidence to show that the third party exchanger was a legitimate money service business and/or obtained their funds lawfully." *Id.* USCIS's Request provided that Le's counsel "may submit such evidence at this time" if her filing did not already "include this evidence." *Id.*

On May 10, 2018, Le's counsel responded providing an economic impact analysis and business plan for the NCE (another item USCIS requested) but no further evidence regarding the lawful source of Le's invested funds. ECF 28-1 at 249–99.

Then, on July 26, 2018, USCIS sent a Request for Evidence (RFE) to Le stating that it had found that she had "not established eligibility for the benefit sought" and requesting additional evidence to "address[] the deficiencies in the record." ECF 28-1 at 242–47. As to the issue before the Court here, USCIS acknowledged and did not question Le's evidence showing how she and her husband acquired the VND she exchanged for USD. *Id.* at 246. It also confirmed the presence of a "currency exchange agreement with Van Vinh Nguyen and VNT Trading and Investment Pte to help exchange VND to USD." *Id.* And USCIS's RFE confirmed the path of funds from Le's VND in her account to VNT Trading's account, and of the USD from VNT Trading's account to the NCE's account. *Id.* However, it said that the record was "unclear" as to "where the funds ($550,025) from [VNT Trading] derived from" and that Le "did not submit sufficient evidence showing that [VNT Trading] is a legitimate and/or licensed and registered money service business." *Id.* Thus, the RFE explained, "[t]he record does not contain sufficient evidence to demonstrate the source and path of funds used by [VNT Trading] to assist Petitioner with the currency exchange," because USCIS could not "determine that the funds exchanged by [VNT Trading] were derived from lawful means." *Id.*

The RFE requested that Le submit additional evidence "to demonstrate the source and path of funds used by the third party, [VNT Trading], to assist Petitioner in their currency exchange." *Id.* It provided examples of what those could be. In short, the letter required that Le submit either (1) documentation to demonstrate that VNT Trading was a "legitima[te]" money service business with legitimate funds in its account, or (2) other evidence that the funds transferred by VNT

Trading to the NCE were "obtained through lawful means." *Id.* at 246–47. Such evidence was necessary to show that the funds that Le invested in the NCE were "capital that ha[d] been obtained through lawful means." *Id.* at 246.

On October 30, 2018, Le responded to the RFE. ECF 28-1 at 169. Her letter purported to provide the requested evidence on the lawful source of Le's investment, including a "Business Registration Certificate," signed and stamped by the Ho Chi Minh City Business Registration Office, for a company that goes by the English name, "Minh Long Company Limited." *Id.* at 192. The certificate appeared to list the "[l]ines of business" for which that company was registered, including "[o]ther financial service activities," specifically, "[s]upply agent of money transmission service." *Id.* It also included a short "Legal Consulting Letter" from a Vietnamese attorney, addressed generally to "[v]aluable customers," stating that the money given to "this Company" for the purpose of "money transferring for investment projects" was "compliant with the stated regulations." *Id.* at 198. According to Le's counsel, this exhibit "confirm[ed] that the exchange of funds was legal and appropriate under Vietnamese law." *Id.* at 171.

In addition, Le's October 2018 letter stated that VNT Trading was "a Singapore-based business with many lines including as a currency exchanger, and affiliated with Minh Long Co. Ltd., its Vietnamese entity." *Id.* at 170. Her letter claimed that the above information "demonstrate[d] that Minh Long and VNT Trading were authorized to conduct currency exchanges. *Id.* at 173. Finally, the letter objected to the agency's request for the above information about Le's currency swap as inconsistent with the governing regulation (and precedents interpreting it), as an invalid legislative rule due to the lack of notice-and-comment for the supposedly new requirements regarding currency swaps, and as arbitrary and capricious. *Id.* at 173–76. According to Le's counsel, "[w]hile a petitioner bears the burden of proof in

demonstrating the funds invested in a project are his or her property and were lawfully earned, we believe the requests made here go beyond what is required" by "requiring evidence of the source of all converted funds." *Id.* at 173–74.

On November 27, 2018, USCIS sent Le a Notice of Intent to Deny. *Id.* at 161. The Notice stated that USCIS intended to deny Le's petition based on her failure to show that the invested capital was obtained through lawful means (one of the two issues identified in the RFE). *Id.* at 164. It stated, again, that "USCIS cannot determine that the funds exchanged by Minh Long Money Transfer, and ultimately, Van Vinh Nguyen and VNT Trading and Investment Pte. were derived from lawful means." *Id.* at 165. Further, the Notice pointed to discrepancies and inconsistencies in the documents submitted. Most notably, USCIS found that the purported business registration certificate for Minh Long Company Limited, which Le's counsel provided in the previous letter, was apparently forged, as its registration number belonged to a different company—Thanh Long Jewelry Co. Ltd. *See id.* The Notice once again requested additional evidence for petitioner to prove the lawful source of her invested funds as required by 8 C.F.R. § 204.6(j)(3) and listed the specific documents that would cure the deficiencies in her petition. *Id.* at 166. The listed documents included multiple ways of evincing that VNT Trading was lawfully registered to conduct currency exchanges in Vietnam and Singapore. *See id.* The Notice did not request any information about the source(s) of VNT Trading's funds.

Undeterred, Le responded to the Notice through counsel with more information and explanation. This response called the previously provided "path of funds" evidence "indisputabl[y] . . . sufficient for approval of this Petition." *Id.* at 93. Le charged that USCIS was "for some reason fixated on a relationship between parties to the transactions described above, which she called "irrelevant, of course." *Id.* Le said the "salient issue" was "how and when money

was transferred and whether that was legal under the rules of wherever it occurred" and that, "in this case, all the transfers are clear and the Petitioner has gone so far as to get legal opinions to confirm that they were lawful." *Id*. In addition, the letter attached a new "explanatory statement" of a "company employee at the VNT Trading Co./ Minh Long family of companies" (Ms. Nguyen). *Id.* That statement "explain[ed] how the various names and business entities are related," namely that "these are a bunch of related companies (and, in some cases, their affiliated trade names) controlled by the same family." *Id.* For example, the statement represented that Ms. Nguyen's father owned Thanh Long Jewelry Co. Ltd., which then operated a "[b]rand name" called Minh Long Money Transfer, of which Ms. Nguyen was the manager. *Id.* at 139. Le added that, "of course, all of this has absolutely nothing to do with what is actually relevant to the adjudication of this case." *Id*. at 93. Her response also included another legal advisory letter regarding the currency swap agreement between Le and a representative of VNT Trading stating, "From my point of view, in terms of legal matter, the aforementioned transactions have been legally conducted as per the law of Vietnam." *Id*. at 144–47.

That did not suffice for USCIS, which issued its Notice of Decision (NOD) denying Le's petition on March 5, 2019. ECF 28-1 at 69. The NOD found that Le still had not established that the invested capital was obtained through lawful means, despite her additional submission. *Id.* at 72–73. USCIS also found that Ms. Nguyen's explanation that Minh Long Money Transfer and Minh Long Company Limited were just "unofficial trade names" of VNT Trading was "insufficient to address the inconsistencies and derogatory information noted in the NOID and present[ed] other issues." *Id.* at 75.

So Le tried one more time. On April 5, 2019, through new counsel, Le moved to reopen the denial and permit the introduction of additional evidence. ECF 28-1 at 33. Le insisted that

USCIS's concerns related not to the "source of funds" but rather to "the pathway that her lawfully acquired all-cash capital contribution in Vietnam was swapped . . . to the WashingtonFirst escrow account for the [NCE]." *Id.* at 34. Still, in a tonal shift, her letter conceded that "the RFE and NOID contained appropriate inquiries" and expressed "regret if there was any questioning of this appropriateness in earlier responses." *Id.* at 36. Le's counsel stated that he "d[id] not know why, when Ms. Le signed an agreement with Thanh Long Jewelry Company, an apparently false business registration document was procured by a third party agent and provided to prior counsel." *Id*. at 37. The letter claimed that Le's prior counsel was given a false document without Le's knowledge or involvement, and asked that Le "not be held responsible for this improper actions [*sic*] by a third party." *Id*. Finally, Le's letter concluded that, even before that due diligence investigation was completed, there was sufficient evidence in the record to demonstrate a lawful source of capital because "it appears that Thanh Long Jewelry Ltd. [was] authorized to distribute funds and to conduct swaps and that the bank transfer from Singapore to the U.S. [was] legal." *Id.* at 38.

USCIS once again disagreed. On December 11, 2020, USCIS denied Le's motion to reopen because Le did not provide "any new facts" "in support of the motion to reopen." *Id.* at 5–6.

### C. Procedural History

Le filed a complaint in this Court challenging USCIS's denial on three bases. First, she claims that USCIS's denial of her petition was arbitrary and capricious in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), because the relevant regulations do not require investors to prove that third-party currency exchangers acquired their assets lawfully. ECF 1 ¶¶ 52–62 (Count 1). Second, she alleges that USCIS's policy requiring information about third-party currency exchangers' lawful source of funds was a "radical break in adjudicatory

practice" in early 2017, and that before then, USCIS only required lawful acquisition of assets by "investors," not by the third-party currency exchangers. *Id.* ¶¶ 63–72 (Count 2). She alleges that it was inequitable to apply that requirement to her petition, which she filed in 2016. *See id.* Third, Le contends that USCIS's rule requiring investors to present lawful-source-of-funds evidence for third-party currency exchangers is a rulemaking that requires notice and comment, which did not occur, and may only be applied prospectively. *Id.* ¶¶ 73–76 (Count 3).

Le moves for summary judgment on Counts 1 and 3 (her APA claims) and seeks outside-the-administrative-record discovery on Count 2 (her retroactivity claim). Defendants cross-move for summary judgment on all three claims and, as an alternative, in opposition to discovery on Count 2. ECF 22.[4]

## II.    LEGAL STANDARD

On summary judgment in an APA case, the district court's review is limited to "determining whether, as a matter of law, the evidence in the administrative record supports the agency's decision." *Truong v. United States Citizenship & Immigr. Servs.*, No. 21-cv-316, 2023 WL 4234658, at *4 (D.D.C. June 28, 2023) (citing *Citizens for Resp. & Ethics in Washington v. SEC ("CREW")*, 916 F. Supp. 2d 141, 145 (D.D.C. 2013)). "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* (quoting *CREW*, 916 F. Supp. 2d at 145).

---

[4] Defendants also argued in their cross-motion that the case should be dismissed as moot because Congress had failed to renew the EB-5 "Regional Center Program" through which Le applied for a visa. ECF 22 at 10–11. However, Defendants later withdrew that motion after Congress reauthorized the Regional Center Program in March 2022. *See* ECF 31 at 2–3.

### III.    ANALYSIS

The Court first addresses Le's APA claims and then moves to her retroactivity claim and its attendant discovery request. None has merit. First, USCIS's denial of Le's petition was not arbitrary and capricious; it was instead consistent with the applicable regulation, despite some excesses in Defendants' language at certain points in the record. Second, USCIS's decision did not improperly implement a legislative rule without notice and comment because, again, it followed straightforwardly from the best reading of the existing regulation's text and did not amend it. Finally, discovery on Le's retroactivity claim is not warranted, and the claim fails, under the governing legal rules.

### A.  USCIS's Denial Was Not Arbitrary and Capricious

Under the APA, the Court "shall . . . hold unlawful and set aside agency action" that it finds "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's action is "normally" arbitrary and capricious when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Still, a court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). In addition, "an agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations.' *Nat'l Env't Dev. Ass'n's Clean Air Project v. E.P.A.*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quoting *Environmentel, LLC v. F.C.C.*, 661 F.3d 80, 85 (D.C.Cir.2011)).

To briefly summarize USCIS's decision, the agency denied Le's petition on the basis that she did not show that the invested funds were "capital that has been obtained through lawful means." ECF 28-1 at 73. USCIS pointed to "multiple inconsistencies and the unsupported assertions in the record" which it said were "insufficient to establish that [Le's] capital investment derived from a lawful source." *Id.* at 78. Specifically, USCIS stated that it could not "determine that the funds invested—directly and indirectly—derive from lawful means because the record does not contain sufficient evidence to demonstrate the lawfulness of the method used by [VNT Trading] to exchange Petitioner's VND to USD" and that "[Le] bears the burden on demonstrating that the funds invested into the NCE were obtained through lawful means." *Id.* Throughout the process, USCIS explained that Le could meet that burden by providing either (1) documentation to demonstrate that VNT Trading was a "legitima[te]" money service business with legitimate funds in its account (such as through VNT Trading's licensing and registration documents), or (2) other evidence that the funds transferred by VNT Trading to the NCE were "obtained through lawful means." *Id.* at 246, 252. USCIS found that the documents Le submitted to establish (1), such as VNT Trading's registration documents in Vietnam and Singapore, had discrepancies (including that the Vietnamese document was apparently fabricated) and that Le did not submit sufficient documentation of (2) because of deficiencies in other Singaporean documentation. *See id.* at 75–78.

i.    The Parties' Arguments

Le argues that those discrepancies and deficiencies are irrelevant under the governing regulation, 8 C.F.R. § 204.6. According to Le, the plain text of the regulation "requires EB-5 applicants to show that they acquired the assets used to make an EB-5 investment lawfully. It does not require, as USCIS suggested . . . , that investors must make that showing for third-party

currency exchangers." ECF 20 at 22. She gets there as follows. First, Le notes that the definition of "capital" in § 204.6(e) asks about how the "assets" were "acquired" *by the investor/petitioner*, not "by third parties that engage in arms-length commerce with the applicant." *Id.* at 24. That interpretation is confirmed, Le argues, by the statute, which makes clear that "capital" is what the EB-5 petitioner "invests." *Id.* (citing 8 U.S.C. § 1153(b)(5). Thus, the question of how the assets were "acquired" in the definition of "capital" pertains to how the petitioner acquired the assets. Second, Le notes that the types of evidence that a petitioner can use to prove such lawful acquisition confirm that the relevant inquiry is the petitioner's acquisition of the funds invested, not someone else's. *See* ECF 20 at 24–25 (citing 8 C.F.R. § 204.6(j)(3)). "This regulation focuses on how the *EB-5 applicant* acquired the assets used to make her investment," Le argues, and "nowhere mentions the acquisition of assets by any other party." *Id.* at 25. Finally, Le contends that the regulation's inquiry into the "indirect[]" acquisition of the assets also does not "expand the regulation's reach to third-party acquisitions outside the chain leading to the investor's final acquisition." *Id*. Le points to regulatory history showing that the "directly or indirectly" language was added "to effectuate Congress's intent that the visa process be discontinued 'if it becomes known to the Government that the money invested was obtained *by the alien* through other than lawful means (such as money obtained through the sale of illegal drugs)." *Id*. at 26 (citing Employment-Based Immigrants, 56 Fed. Reg. 60,897, 60,902 (Nov. 29, 1991) (quoting S. Rep. No. 101–55, 101st Cong., 1st Sess. 21 (1989)) (emphasis added)). Given that interpretation of the regulation, Le argues, she proved that her funds invested were acquired through lawful means by showing how she made the $12 billion VND that she then exchanged through VNT Trading and invested into the NCE in the United States. ECF 20 at 27.

In addition, Le insists that the regulation does not authorize "USCIS to demand evidence about the business dealings of currency exchangers," because "exchange" or "transfer" is "distinct from the 'acquisition' of new assets." *Id.* at 28. And even if the regulation could be interpreted to cover exchange, that would "target only the *investor's* conduct in the currency exchange," not that of "the money exchanger." *Id.* at 29. Further, Le warns that USCIS's interpretation "has no limiting principle" because it would authorize USCIS to "look beyond the investor's acquisition of funds" to "any unlawful transaction by any party engaged in commerce with the investor," such as requiring Le to show that "the buyers of the three properties she sold to fund her EB-5 investment acquired *their* assets through lawful means." *Id.* at 30. Finally, Le argues that the agency's decision is not entitled to deference under the rule of *Auer v. Robbins*, 519 U.S. 452 (1996). *Id.* at 31

Defendants respond that USCIS acted within the bounds of its regulation and BIA precedent in requiring the information it sought, unsuccessfully, from Le. According to Defendants, Le had the burden under the regulation to show that *all* the capital she invested, including that which came from "a third party" (i.e., VNT Trading), was "lawfully sourced"—and that she failed to do so. ECF 22 at 42. Defendants also argue that Le failed to "trace the complete path of her investment funds," long required as a way to evidence the regulation's "lawful source" requirement, by not "prov[ing] the lawful conduct of third-party currency exchangers." *Id.* at 46–50. Finally, Defendants argue that the agency's interpretation is owed deference under *Auer. Id.* at 51.

ii.    The Court's Decision

USCIS's decision was consistent with the regulation and not arbitrary and capricious. When interpreting a regulation, courts apply "all the standard tools of interpretation," including the "text, structure, history, and purpose of the regulation." *Kisor v. Wilkie*, 588 U.S. 558, 573–75

(2019). Under the enabling statute, the petitioner must have "invested" or be "actively in the process of investing[] capital" in a "new commercial enterprise." 8 U.S.C. § 1153(b)(5)(A) (2006). And under the regulation, that "capital" may not include "[a]ssets acquired, directly or indirectly, by unlawful means." 8 C.F.R. § 204.6(e). Le correctly notes that this text, in context of the rest of the regulation and given the regulatory and legislative history, refers to acquisition of the assets by the petitioner, not by a third party. So, too, does the requirement in § 204.6(j)(3) that outlines the evidence the petitioner must provide to show that the capital invested was "obtained through lawful means." But that does not solve Le's problem, because USCIS's decision was justified based solely on a concern with *Le's* acquisition of the capital, not acquisition by the third party.

To see why requires disentangling the regulation's component parts. As interpreted by the BIA and courts for decades, § 204.6 imposes two requirements pertinent to this case: a petitioner "must show [a] that the funds are his own and [b] that they were obtained through lawful means." *In re Soffici*, 22 I. & N. Dec. 158, 158 (B.I.A 1998). The agency typically refers to those two requirements collectively as the "source of the funds" requirement. *See id*. at 158, 165. But they are somewhat distinct. The first requirement, that the funds invested are the petitioner's own, is typically supported by evidence of what the agency calls the "path of the funds" from a bank account in the petitioner's name, through any intermediary accounts or wire transfers, to the bank account of the NCE. *See, e.g.*, *In re Izummi*, 22 I. & N. Dec. at 195; *Sadeghzadeh v. United States Citizenship & Immigr. Servs.*, 322 F. Supp. 3d 12, 17–18 (D.D.C. 2018). As Defendants explain, petitioners satisfy this requirement "by sufficiently documenting the transfer path of the investment funds from their point of origin through any intermediary accounts, to their deposit into the [NCE's] custody or escrow account." ECF 22 at 44. This evidence proves that "the actual funds

that entered the United States came from [the petitioner]," not "from some other source." *Sadeghzadeh* , 322 F. Supp. 3d at 18 n.5.

Meanwhile, the second requirement proves that the petitioner obtained those funds (the funds invested, which must be her own) through lawful means. The petitioner can prove that with evidence of the transaction that led to the petitioner "obtaining" the funds. For example, where a petitioner claims that they obtained the funds they invested through the sale of one of their houses, they must submit "documentation, such as a sales contract or deed establishing ownership and price," to prove that the funds purportedly acquired through that sale "have been lawfully obtained" (i.e., that it was in fact done through a legal sale of a home). *In re Soffici*, 22 I. & N. Dec. at 164–65. *See also In re Ho*, 22 I. & N. Dec. 206, 210 (B.I.A. 1998) (holding that the petitioner must establish (1) "that he has placed his own capital at risk, that is to say, he must show that he was the legal owner of the invested capital" and (2) "that he acquired the legal ownership of the invested capital through lawful means").

Those interpretations accord with the text and structure of the regulation. Start with the text's plain meaning. Again, under the regulation, the "capital" invested in the NCE may not include "[a]ssets acquired, directly or indirectly, by unlawful means." 8 C.F.R. § 204.6(e). "Acquire" means "to get as one's own," "to come into possession or control of," or "to get or obtain." *Acquire*, Merriam Webster's Dictionary (2024); *Acquire*, Black's Law Dictionary (10th ed. 2014). "Direct" means "natural," "straightforward," "proceeding by the shortest way," "stemming immediately from a source," or "marked by absence of an intervening agency, instrumentality, or influence." *Direct*, Merriam Webster's Dictionary (2024); *see also Direct*, Black's Law Dictionary (10th ed. 2014) ("[f]ree from extraneous influence"); *Directly*, Black's Law Dictionary (10th ed. 2014) ("[i]n a straight line or course). "Indirect" means "deviating from

a direct line or course" or "not directly aimed at or achieved." *Indirect*, Merriam Webster's Dictionary (2024). Finally, "means" refers to "something useful or helpful to a desired end," *Means*, Merriam-Webster's Dictionary (2024), or "[s]omething that helps to attain an end; an instrument; a cause," *Means*, Black's Law Dictionary (10th ed. 2014). Similarly, petitioners must show that they have "invested or [are] in the process of investing capital obtained through lawful means." 8 C.F.R. § 204.6(j)(3). "Obtain" means "to gain or attain usually by planned action or effort" or "to bring into one's own possession; to procure, esp. through effort." *Obtain*, Merriam-Webster's Dictionary (2024); *Obtain*, Black's Law Dictionary (10th ed. 2014).

Thus, the question under the regulation is (a) whether the funds are the petitioner's "own" (i.e., in the petitioner's possession or control), and (b) whether the "instrument" used to "bring into [the petitioner's] possession"—including both the "direct" acquisition (i.e., from the "immediate source" and "free from extraneous influence") and the "indirect" acquisition (i.e., through methods that "deviated from a direct line or course")—were legal.

Here, the Parties do not appear to dispute that Le established  that the funds invested were her own. At a minimum, it is clear from the record that USCIS did not reject her application on the basis of lack of evidence that the funds invested were her own, so Defendants could not argue now that she failed that requirement anyway. *See* ECF 28-1 at 73, 75–78 (USCIS's notice of decision denying the petition, which listed six deficiencies in Le's application that meant that she had not "establish[ed] that the capital which has been invested by [Le] . . . has been obtained through lawful means," but not listing any concerns over evidence that "the capital was . . . her own"). That makes sense, because Le submitted with her original petition evidence showing her ownership of funds in a bank account in Vietnam and transfer of those funds through VNT to the NCE's account in the United States. The record evidence stated, among other things, that VNT

"never asserted any ownership right to" Le's funds and that VNT's "role was limited exclusively to the conversion of Ms. Le's personal property—the funds—to U.S. dollars and we have acted at her direction at all times." *Id.* at 540–42. The agency reasonably found that Le satisfied her burden to show "the transfer path of the investment funds from their point of origin [i.e., the petitioner's bank account] through any intermediary accounts, to their deposit into the [NCE's] custody or escrow account," as is required for showing that the funds were the petitioner's own. ECF 22 at 44.

The only question for the agency, and the basis for its denial, was whether those dollars invested were "obtained" by the petitioner "through lawful means." ECF 28-1 at 245–46. And on that score, USCIS made clear, multiple times, that Le could prove that her invested funds were obtained through lawful means by submitting documentation that either (a) "demonstrate[d] the legitimacy of the exchanger/broker and its funds (such as licensing and registration documents)" or (b) "demonstrate[d] that the funds transferred by the third party to Petitioner's bank account/the NCE were obtained through lawful means." *Id.* at 252. Le could show, in other words, that she obtained the USD either through a lawful, licensed currency exchange or through some other lawful, if unofficial, trade of VND (or other items of value) for USD.

Le asserts that USCIS lacks the authority under its rule to inquire into the lawfulness of the funds VNT Trading transferred to the NCE because "the relevant 'acquisition' of assets is the EB-5 applicant's acquisition—not the acquisition of assets by third parties that engage in arms-length commerce with the applicant." ECF 20 at 24. But the rule requires proof that both the "direct" acquisition of the funds and any "indirect" acquisition of the funds was done through legal means. *See* 8 C.F.R. 204.6(e). Le acquired the USD "directly" from VNT Trading. She thus had to show that (1) that acquisition was done lawfully. She also had to prove (2) the legal means of her

"indirect" acquisition of the funds—i.e., the transactions that gave her the VND that she exchanged with VNT Trading for the USD she invested in the NCE. She proved the lawfulness of that indirect acquisition through the records of the sale of her husband's properties, which they purchased with his work income (also evidenced). Finally, she had to show (3) how the funds belonging to her made their way to the NCE (i.e., the path of the funds), to establish that those funds were her own. As discussed above, she showed that, too. But because she only showed (2) and (3), not (1), her petition failed. USCIS reasonably rejected her application on that basis, after giving her multiple warnings that it would do so and chances to supplement the record.

Le tries to escape that conclusion by arguing that the term "acquire" or "acquisition" in the rule does not encompass "exchange" or "transfer." But she offers no authority for that claim besides an unsupported assertion that "[a]n English speaker would not typically describe a traveler's exchange of foreign currency to local currency as the 'acquisition' of new assets." ECF 20 at 28. As discussed above, "acquire" means "to get as one's own," "to come into possession or control of," or "to get or obtain." *Acquire*, Merriam Webster's Dictionary (2024); *Acquire*, Black's Law Dictionary (10th ed. 2014). The record makes clear that Le "c[a]me into possession or control of" the dollars transferred to NCE via her transaction with VNT Trading. As Le herself describes, she "contracted with a third party to 'swap' her Vietnamese currency (VND) to U.S. dollars, and then to transfer *that money* [i.e., the "U.S. dollars"] to the EB-5 business in the United States." ECF 20 at 17 (emphasis added). Indeed, in her submissions to USCIS, she described the currency swap as follows: "[VNT Trading] collected funds in Vietnam from [her] and provided her with funds (via its wire to [the NCE]) that i[t] had received in U.S. dollars from an unrelated transaction." ECF 28-1 at 171. She thus "obtained" or "acquired" the "funds" she invested from VNT Trading. The question that the agency rightly sought to answer, then, was

whether she obtained them through lawful means. And Le did not provide enough evidence for USCIS to answer that question in the affirmative.

Finally, Le is incorrect that USCIS's decision relied on an inquiry into the "lawful conduct of third-party currency exchangers," rather than just her own conduct. ECF 20 at 29. The agency sought evidence that Le's acquisition of the U.S. dollars transferred to the NCE was lawful and made clear that such evidence would be sufficient for her to meet the lawful source requirement. She could not prove that because of discrepancies and inconsistencies that failed to establish that it was a lawfully licensed exchange or otherwise a lawful transaction.

Still, some of the agency's language in its briefing and in the record does go too far in the direction of the kind of inquiry to which Le objects. For instance, Defendants argue in their briefing that USCIS required "evidence to show where the third-party's (that is, VNT Trading's) funds originated." ECF 22 at 21. Similarly, a February 2016 speech by a USCIS official stated that "depending on the specific circumstances, [USCIS] may require evidence from the petitioner to validate the lawful source of third party funds involved in the transaction" when the transaction involves "private currency exchange." ECF 28-1 at 585. Although the Court need not decide whether such a broader inquiry would go too far, because the agency did not rely on it here, the Court observes that the agency's precedential decisions interpreting the regulation inquire only into how the investor/petitioner acquired the invested funds, not how other third parties with whom she exchanged acquired the funds. Le is correct that an interpretation inquiring into those third parties' acquisitions of funds "has no limiting principle" and would lead to absurd results. *See* ECF 20 at 30–31; *accord Zhou v. Noem*, No. CV 19-2650 (TJK), 2025 WL 416152, at *8 (D.D.C. Feb. 6, 2025) (criticizing such an interpretation because it "admits of no limiting principle"). Accordingly, other judges in this District have held that the regulation does not permit the agency

to inquire into the source of the third party currency exchanger's funds. *See id.*; *Sun v. U.S. Citizenship & Immigr. Servs.*, No. 21-cv-1612, 2025 WL 947463, at *8 (D.D.C. March 28, 2025).

Defendants attempt to save their broader interpretation by pointing to 8 C.F.R. § 204.6(g). *See* ECF 22 at 34. That provision requires that "the source(s) of all capital invested [be] identified and all invested capital [be] derived by lawful means" when the same NCE is used as the basis for more than one EB-5 petition. 8 C.F.R. § 204.6(g)(1). But the agency did not rely upon or cite that requirement in the administrative record, so it was not a basis for the agency's decision that the Court can consider. *See Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 93–94 (1943). Further, that provision is titled "multiple investors" and asks about the investments of "each petitioning investor." 8 C.F.R. § 204.6(g). In context, it seems likely that that provision applies only to the source of each petitioner's/investor's funds, not the source of third parties' funds who are not petitioners/investors. *Accord Zhou*, 2025 WL 416152, at *7.

Here, the agency's misstatements do not matter because the agency clearly gave Le a way out of any requirement to show the source of VNT Trading's funds. Instead, she merely had to show that the currency exchange was done lawfully by producing, for example, a valid registration or license authorizing VNT Trading to conduct currency exchanges. In other words, at best for Le, the agency denied her petition on two grounds: lack of evidence of a legitimate money exchange and lack of evidence of the lawful source of third-party funds. The Court affirms because one of those grounds (legitimate exchanger) was valid, and there is no evidence that the agency would have granted her petition if it could not have relied on the other ground (lack of source of third-party funds). *See Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1149 (D.C. Cir. 2014) ("Where . . . an agency has set out multiple independent grounds for a decision, we will affirm the agency so long as any one of the grounds is valid, unless it is

demonstrated that the agency would not have acted on that basis if the alternative grounds were unavailable.").[5] The agency's decision thus conformed with the regulation's best reading and was not arbitrary and capricious.

### B.  USCIS's Policy on Currency Swaps, As Applied Here, Was Not a Legislative Rule

Le next argues that, by "requiring investors to prove the lawful source of *currency exchangers'* funds," USCIS's policy regarding review of petitions involving currency swaps "effectively amend[ed]" the existing regulation, 8 C.F.R. § 204.6, and is therefore a new legislative rule that requires notice and comment under the APA. ECF 20 at 44 (quoting, in part, *Am. Mining Cong. v. Mine Safety and Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993)) (emphasis in original). Defendants respond that (a) their policy was not new and had been the policy at least since February of 2016, per a statement included in the administrative record, and (b) even if the interpretation were new, it was an "interpretive rule" that may be adopted through adjudication and not a legislative rule that requires notice and comment. ECF 22 at 54–58.

As an initial matter, the agency did not issue anything purporting to be a "rule"—at the time it made the decision on Le's application or beforehand—regarding its policy on currency swaps. USCIS's denial decision of Le's petition was an adjudication, of course, not a rulemaking. *Neustar, Inc. v. Fed. Commc'ns Comm'n*, 857 F.3d 886, 893 (D.C. Cir. 2017). ("Rulemaking scenarios generally involve broad applications of more general principles rather than case-specific individual determinations.") An agency is generally entitled to "cho[ose] between rulemaking and

---

[5] In *Zhou v. Noem*, where another judge in this District (Judge Kelly) reversed a USCIS decision inquiring into the lawful source of a currency-exchanger's funds, the agency there did not consider whether the petitioner had shown evidence that the exchanger was a "licensed money exchanger," and thus it could not be a basis for the court's decision there until the agency considered that issue on remand. 2025 WL 416152, at *10. The same appears to have been the case in *Sun v. USCIS*, where Judge Kollar-Kotelly reversed the agency's decision denying an EB-5 petition involving a currency swap "based solely on the petitioner's failure to document an intermediary's [i.e., the currency exchanger's] source of funds." 2025 WL 947463, at *8.

adjudication," and is "not precluded from announcing new principles in an adjudicative proceeding." *N.L.R.B. v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 294 (1974). To the extent the agency announced any "new principles" in that adjudication, such an announcement would not necessarily qualify as a rulemaking. The proper way to challenge a principle announced in an adjudication that contravened an existing regulation is instead, as above, to argue that the agency's decision in the adjudication was arbitrary and capricious.

Le insists instead that her denial reflected a then-recently enacted policy that the agency incorrectly classified as an interpretive rather than a legislative rule. Under D.C. Circuit precedent, a rule is "legislative," as distinct from "interpretive" only where it has "the force of law." *Am. Min. Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (1993). And a rule only has such force when "Congress has delegated legislative power to the agency and . . . the agency intended to exercise that power in promulgating the rule." *Id.* The main consideration underlying that question is whether the rule "effectively amends [the] prior legislative rule" by "work[ing] substantive changes" or "major substantive legal additions" to the prior legislative rule. *U.S. Telecom Ass'n v. FCC.*, 400 F.3d 29, 35 (D.C. Cir. 2005) (collecting cases). Put another way, the D.C. Circuit's test asks whether the new rule is "'inconsistent with' an existing regulation." *Id.* (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995)). A legislative rule *amends* the previous regulation; an interpretive rule merely *interprets* it. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 103 (2015) (explaining that an agency can "interpret a regulation without effectively amending the underlying source of law," as it does in an interpretive rule).

As evidence of that supposed legislative rule, Le points to an internal training document in the record that includes guidance for agents on applying the "lawful source" requirements to petitions involving currency swaps. ECF 20 at 45; *see* ECF 28-1 at 545–83. Beyond that, the record

also contains February 2016 remarks by a USCIS official stating that, "depending on the specific circumstances," the agency "*may* require evidence from the petitioner to validate the lawful source of third party funds involved in [a private currency exchange] transaction." *Id.* at 585 (emphasis added). Le does not appear to rely on that second statement.

For one thing, the 2019 slideshow is dated May 6, 2019, two months after USCIS's notice of decision denying Le's petition. *See id.* at 545. So it is difficult to believe that it served as the basis for that decision, no less for the agency's articulation of the evidentiary requirements for Le's application going back to its first communications to Le in early 2018. At a minimum, a not-yet-stated interpretation hardly bears the indicia of a legislative rule. But even if the agency's pronouncements in that 2019 training manual could be considered a rule that formed the basis of USCIS's denial decision, it does not appear to "work substantive changes" to the text of 8 C.F.R. § 204.6 as already promulgated. *U.S. Telecom Ass'n*, 400 F.3d at 34. As discussed above, the agency's decision in this case was a proper interpretation of 8 C.F.R. § 204.6 because it allowed Le to satisfy the "lawful source" requirement through evidence that VNT was a licensed/registered currency exchanger. Such a requirement was consistent with the existing regulation and thus did not "amend" it. The 2019 training manual imposes that same requirement: lawful source can be proved through *either* "documentation to show that [the third party exchanger] is [a] legitimate and/or licensed and registered money service business" *or* that "the third party exchanger's funds derive from a lawful source." ECF 28-1 at 568, 570. Although the second option is inconsistent with the regulation, it is optional, not required, so it merely provides an alternative way to establish lawful source besides what the existing regulation already permits.

The February 2016 remarks, by contrast, do not present exactly that option. But they state only that the agency "may" (not "will") "require evidence from the petitioner to validate the lawful

source of third party funds involved in the transaction." *Id.* at 585. That possibility hardly qualifies as a firm, binding rule. And regardless, the actual adjudication in this case presented another option (the license/registration requirement) that is consistent with the regulation. Accordingly, Le's procedural challenge comes up short.

### C.  Discovery Into Le's Retroactivity Claim Is Not Warranted and the Claim Fails

Finally, Le claims that, even if the agency's denial was not arbitrary and capricious and followed all relevant procedural rules, it nonetheless violated the rule against retroactive application of new agency policies. Le calls this claim a "non-statutory cause of action which asks the Court to prevent USCIS from retroactively applying to [Le's] case a new adjudicatory policy that was not in effect when Plaintiff made her EB-5 investment and filed her I-526 petition." ECF 20 at 38. Le asks that the Court not rule on this claim yet but instead merely grant "the discovery necessary to prove her well-pleaded allegation that USCIS[] abruptly changed its adjudicatory practice and policy in cases involving currency swaps" to Le's detriment. ECF 20 at 35. Specifically, Le requests "production of prior agency adjudications of EB-5 petitions (including approvals) issued in cases involving currency swaps (both before the filing of Plaintiff's I-526 petition and while the petition was pending), as well as internal agency guidance (including instructions, memoranda, orders, emails, and policy directives of supervisory personnel) regarding currency-swap transactions issued before the filing of Plaintiff's I-526 petition." *Id.* at 43.

Defendants ask that the Court instead grant summary judgment in their favor now. They first argue that a retroactivity claim typically does not merit outside-the-administrative-record discovery where, as here, it is redundant of her APA claims. ECF 22 at 25–33. And on the existing record, Defendants continue, Le's claim fails. ECF 22 at 25–39; ECF 27 at 16–17.

Defendants have the better of the argument. Although outside-the-record discovery is warranted in some cases, this case is not one of them because Le does not demonstrate how the

administrative record is incomplete with respect to her claim or how discovery could allow her claim to succeed. Indeed, given the existing record, summary judgment on this claim is appropriate.

In cases reviewing agency action, a party typically cannot get additional discovery unless it can "make[] a significant showing—variously described as a strong, substantial, or prima facie showing—that it will find material in the agency's possession indicative of bad faith or an incomplete record." *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487 (D.C. Cir. 2011). The D.C. Circuit "ha[s] recognized . . . at least three" circumstances that can justify outside-the-record discovery: (1) "[T]he agency deliberately or negligently excluded documents that may have been adverse to its decision,"; (2) "the district court needed to supplement the record with 'background information' in order to determine whether the agency considered all of the relevant factors,"; or (3) "the agency failed to explain administrative action so as to frustrate judicial review." *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008) (quoting *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996)).

At a minimum, that rule applies to claims brought subject to APA section 706, such as an arbitrary-and-capricious claim or a claim for failure to follow proper procedures. *See* 5 U.S.C. § 706 ("In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party . . . ."); *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) ("[I]t is black-letter administrative law that in an APA case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision."). Although there is "some disagreement among district courts whether the assertion of constitutional claims takes a case outside" the record rule, even courts that do not apply the record rule to constitutional challenges still grant discovery only in limited circumstances. *Chiayu Chang v.*

*United States Citizenship & Immigr. Servs.*, 254 F. Supp. 3d 160, 161 (D.D.C. 2017); *see also Bellion Spirits, LLC v. United States*, 335 F. Supp. 3d 32, 43 (D.D.C. 2018), *aff'd*, 7 F.4th 1201 (D.C. Cir. 2021).

But Le's retroactivity claim is not even a constitutional claim. Instead, Le describes it as a claim "under the Court's inherent equitable power" that is not subject to the standards of APA section 706, including the record rule, at all. ECF 20 at 35. Such a claim, asserts Le, warrants additional discovery. Le points to two out-of-circuit cases for support. In *Chang v. United States*, Le says, "the Ninth Circuit recognized the importance of district-court record development" in cases involving retroactivity claims, "noting that district courts are uniquely equipped to 'provide greater redress and broader opportunity to develop a claim than is available in a more limited statutory scheme'" within agency adjudications. ECF 20 at 43 (quoting *Chang v. United States*, 327 F.3d 911, 924 (9th Cir. 2003)). And in *Carlsson v. U.S. Citizenship & Immigr. Servs.*, the district court held that discovery on the parties' retroactivity claim was appropriate, based on *Chang*. No. 2:12-cv-07893, 2015 WL 1467174, at *9–12 (C.D. Cal. Mar. 23, 2015). That court allowed limited discovery "because plaintiffs ha[d] not had the opportunity to conduct discovery on their retroactivity claims, and because they [] set out with reasonable specificity the facts they hope to obtain through discovery and how those facts would help them advance their claims." *Id.* at *12.

Defendants dispute the premise, arguing that Le's retroactivity claim is not a separate cause of action but is instead redundant of her APA claims. ECF 22 at 30. They quote an opinion from a judge on this court, addressing a similar set of claims as here, finding "no authority for the proposition that the retroactivity claim is a separate cause of action that exists outside the APA

and is therefore exempt from the record review rule." *Id.* (quoting *Chiayu Chang*, 254 F. Supp. 3d at 163).

Ultimately, it does not matter here whether a retroactivity claim technically arises under the APA or instead under the Court's inherent equitable authority. Even assuming it is a separate claim outside of the standards of APA section 706, the two cases Le cites as precedents do not justify (no less require, as they are non-binding on this Court) discovery in this case. In *Chang*, as another judge in this district has pointed out, the Ninth Circuit did not actually decide "whether the discovery that had taken place [in the district court in that case] was appropriate." *Chiayu Chang*, 254 F. Supp. 3d at 163. Instead, the Ninth Circuit's statements about the possibility of discovery on certain non-APA claims were merely dicta as to the retroactivity claim. *Id.* at 162. And in *Carlsson*, the court allowed discovery only because the plaintiffs there had demonstrated how the specific facts they sought in discovery "would help them advance their claims." 2015 WL 1467174, at *12. But here, even assuming that low bar applies in this District (instead of the seemingly higher bar for exception to the record rule applied by courts in this District), Le does not clear that bar.

Why not? The substantive requirements of a retroactivity claim reveal the futility of Le's requested discovery. In *Retail, Wholesale & Dep't Store Union, AFL-CIO v. N. L. R. B.*, the D.C. Circuit explained that a retroactivity claim requires balancing "the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles" against "the ill effect of the retroactive application of a new standard" to a party subjected to it in an adjudication. 466 F.2d 380, 390 (D.C. Cir. 1972) (quoting *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 203 (1947)). The Circuit laid out five factors that courts typically consider when conducting such a balancing:

> (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

*Id.* In general, the first factor "tends by its nature to cut in favor of retroactive application of a new principle," because it seeks to "reward[]" "parties who challenge old doctrines" and "bring[] about [a] change in the law." *Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1082 n.6 (D.C. Cir. 1987) (en banc). Le makes no argument or allegations regarding that first factor. The other four factors "boil down . . . to a question of concerns grounded in notions of equity and fairness." *Id.* All told, "the circumstances in which a rule may be announced but not applied in an adjudication are few," and the D.C. Circuit therefore bars retroactive application "only when such application would work a 'manifest injustice.'" *Gen. Am. Transp. Corp. v. I.C.C.*, 872 F.2d 1048, 1061 (D.C. Cir. 1989) (quoting *Clark-Cowlitz*, 826 F.2d at 1081).

Here, Le has not demonstrated that the facts she seeks would help her advance her claims that retroactive application of the agency's decision in this case would work a manifest injustice. Le claims that production of prior agency decisions and informal agency guidance that are not already publicly available would help her prove the agency's "abrupt departure from well-established practice" and claimed "statutory interest." *Id.* at 1060 n. 18 (quoting *Retail, Wholesale*, 466 F.2d at 391). The first problem with that argument is that the policy change Le claims USCIS applied in her adjudication is not actually the one the agency applied. Le claims that, "[b]efore 2017, EB-5 investors 'did not submit (and USCIS did not request) evidence that third parties who exchanged and transferred currency as part of a currency swap acquired *their* currency through lawful means," and that only in 2017 did it "start[] requiring investors to show that third-party exchangers used currency they had acquired lawfully." ECF 20 at 15. But, as explained above,

USCIS did not require that Le show the lawful source of the third-party exchanger's funds. Instead, she could meet the agency's requirements by showing merely that VNT Trading, her exchanger, was licensed or registered to conduct the exchange it conducted. Such a requirement asked about the lawful source of *her* U.S. dollars, which she acquired from VNT Trading, not about the lawful source of VNT Trading's funds. Thus, even if Le were to discover evidence that USCIS abruptly changed its policies to start requiring proof of the third-party exchanger's lawful source of funds, that would say nothing about the rule that the agency applied *to her*.

Moreover, nowhere does Le allege that the policy of requiring evidence that the currency exchanger was lawfully licensed/registered was even new—no less that it was an "abrupt departure from well established practice" or an "attempt[] to fill a void in an unsettled area of law," as the second *Retail, Wholesale* factor requires. 466 F.2d at 390. Instead, Le discusses the novelty only of the inquiry into the source of third-party exchangers' funds. *See, e.g.*, ECF 20-1 at 2–4; *see also* ECF 1 ¶ 65 ("Before 2017, USCIS routinely approved I-526 petitions in which a foreign investor relied on currency swaps to exchange and transfer lawfully acquired funds to a new commercial enterprise in the United States. In adjudicating these petitions, USCIS required investors to show that they lawfully acquired the assets used to make their EB-5 investments, but imposed no similar demands regarding currency swaps used to exchange and transfer assets"). At best, one of Le's allegations in her complaint *could* be read to also encompass the license/registration requirement. *See id.* ¶ 66 ("In a sharp break with prior practice, the agency began insisting that investors produce detailed evidence regarding the third-party entities that assisted them in exchanging and transferring local currency th[r]ough currency-swap transactions."). But that allegation is too general to be helpful. For instance, it is not at all clear that a license or registration would constitute

"detailed evidence," even if that is what she meant. Further, her briefing does not make any such argument.

Le also comes up short on the other *Retail, Wholesale* factors. As to the third factor—the party's reliance on the former rule—it remains unclear how discovery into adjudications or policy guidance/training manuals that Le does not already have within her possession or knowledge could have induced reliance on her part. The retroactivity rule protects parties' "settled expectations—expectations on which a party might reasonably place reliance." *Qwest Servs. Corp. v. F.C.C.*, 509 F.3d 531, 540 (D.C. Cir. 2007). That reliance must be both "reasonable" and "actual." *Id.*; *Sierra Club v. E.P.A.*, 719 F.2d 436, 468 (D.C. Cir. 1983); *see also AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 393 (3d Cir. 1994) (explaining that *Chenery*, the source of the *Retail, Wholesale* rule, requires "actual reliance," a subjective question, not just reasonable reliance, an objective question). To the extent Le actually relied on an old rule that did not require a lawful license/registration of the currency exchanger, the discovery she requests into agency decisions and policies about which she did not know would not reveal that.

The fourth factor—the burden that the supposed new rule imposed on Le—also weighs against her. The record establishes that Le had multiple opportunities to provide accurate information about the legal registration or license of VNT Trading and that she instead provided inconsistent and apparently fabricated information. Le was notified of USCIS's license/registration requirement in its first Courtesy Request for Clarification, which it sent to Le's counsel in May 2018, nearly a year before Le's eventual denial. *See* ECF 28-1 at 251–52. And the agency gave Le three opportunities to submit such information before its denial, as well as another opportunity after denial to supplement the record with that information and seek reconsideration. Again, it is unclear that Le even understood the license/registration requirement to be a "new rule,"

and thus that she could have been burdened by it at all. But even if she does allege that the license/registration requirement alone constituted a new rule, it is not clear how she could have been burdened by it (assuming, again, that she actually relied on the old rule) given the multiple opportunities she had to provide that information.

Two other points merit mention. First, of course, it is possible that such information did not exist because VNT Trading was in fact not lawfully licensed or registered. But Le has not explained why it would be reasonable for her to rely on a notion that she could use an illegal currency exchanger or why it would be an excessive burden to find a licensed currency exchanger given the extensive evidence she submitted about the lawfulness of currency swaps in Vietnam. Second, Le surely does face some burden now as a result of the alleged retroactive application of this rule to her, to the extent her money is tied up in an investment in the United States and yet it will not result in her obtaining a visa. But Le herself mentions the possibility of getting a "refund of her capital investment" from the NCE. ECF 20 at 34. Further, it is not clear to the Court that such money would then be tainted for all time just because the initial exchange was done through an exchanger that she did not prove was licensed. The case she cites for that proposition involved the permanent tainted-ness only of money that was found beyond a reasonable doubt, in a criminal trial, to have been used unlawfully. *See United States v. Abbell*, 271 F.3d 1286, 1296 (11th Cir. 2001). No such finding was made here.

Finally, the fifth *Retail, Wholesale* factor weighs against Le because USCIS has a clear interest in enforcing its own regulations to prevent money obtained through unlawful means from being invested in the United States and thereby cleaned through its own visa process. *See* ECF 27 at 10 (arguing that Le's position would undermine the government's ability to "ensure that the money used [in the EB-5 investment] is clean" and would "create a massive loophole in the

33

regulations to further de-legitimize the EB-5 program, which is already 'well known for its susceptibility to fraud and abuse'") (quoting *Mirror Lake Village, LLC v. Wolf*, 971 F.3d 373, 378 (D.C. Cir. 2020) (Henderson, J., concurring)). Although additional discovery might reveal that the agency did not typically inquire into the lawful licensing/registration of third-party exchangers prior to 2017 (assuming, again, that that is even Le's claim), such evidence would not necessarily undermine the government's interest in starting to do so as currency swaps became more commonly used. And anyway, that notion is undermined by the agency's own statement in early 2016 that it was already closely scrutinizing EB-5 applications involving currency swaps.

All told, Le's requested additional discovery would not meaningfully help her retroactivity claim. Given that finding, as well as courts' general disfavor of outside-the-record discovery in agency cases, the Court will not grant the requested discovery here. In addition, because at least four of the *Retail, Wholesale* factors weigh against Le's retroactivity claim for the reasons just stated, the Court will grant summary judgment against Le and in favor of Defendants on that claim.

\* \* \*

For the foregoing reasons, Le's motions for summary judgment and for leave to conduct limited discovery, ECF 20, are **DENIED**, and

Defendants' cross-motion for summary judgment, ECF 23, is **GRANTED.**

A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: June 24, 2025